FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 01 2019

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE UNITED STATES OF AMERICA
ex rel. John Doe,

    *Plaintiff*,

v.

BIOCONFIRM LABORATORIES, LLC;
and UNKNOWN LABORATORIES Nos. 1 - 50.

    *Defendants*.

Civil Case No. **1:19-CV-4430**

Jury Trial Demanded

# ORIGINAL COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

**[FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)]**

1

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, by and through the *qui tam* Relator, John Doe, brings this action under 31 U.S.C. § 3729, *et seq.*, (the "False Claims Act" or "FCA") to recover civil damages, penalties and attorney fees from Defendants.

## PARTIES

1. Plaintiff is the United States of America.

2. Relator is an individual and citizen of the United States of America. Relator files this action under the pseudonym "John Doe" on leave of Court.

3. BioConfirm Laboratories, LLC ("BioConfirm") is a Georgia limited liability company with a primary place of business at 6755 Peachtree Industrial Blvd., Doraville, GA 30360. BioConfirm's registered agent for service of process is M. Todd Westfall, 3101 Towercreek Pky., Suite 600, Atlanta, GA 30339.

4. Unknown Laboratories Nos. 1 through 50 (the "Unknown Laboratory Defendants") (collectively with BioConfirm, "Defendants) are presently unidentified clinical laboratories located throughout the United States. BioConfirm and/or the families who own BioConfirm own and/or control the Unknown Laboratory Defendants and use them to bill Medicare for the genetic tests at issue in this lawsuit.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action pursuant to 31 U.S.C. §3732(a) (False Claims Act) and 28 U.S.C §1331 (Federal Question).

6. Venue is proper in this Court under 28 U.S.C §1391(b) and/or 31 U.S.C. §3732(a) because: (i) one or more defendants can be found, reside, or transact business in this judicial district: (ii) one or more acts proscribed by 31 U.S.C. §3732 occurred in this district; and (iii) a substantial part of the events or omissions giving rise to the asserted claims occurred in this district.

7. The facts and circumstances of Defendants' FCA violations described herein have not been publicly disclosed, including in: (i) a criminal, civil, or administrative hearing, (ii) a congressional, administrative, General Accounting Office, or Auditor General report, hearing, audit, or investigation; or (iii) the news media.

8. Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the False Claims Act, and he has provided disclosures of the allegations made herein to the United States prior to filing.

## FACTUAL BACKGROUND

9. <u>The Tests.</u> Next Generation Sequencing ("NGS") is a DNA sequencing technology that allows for the quick and cost-effective sequencing of an individual's genome. It is a new technology, and it enables healthcare providers to better: (i) assess a patient's risk of certain hereditary diseases and medication side effects; and (ii) predict the likely success of a particular treatment.[1]

10. In 2018, the Centers for Medicare & Medicaid Services ("CMS") expanded the circumstances for Medicare and Medicaid reimbursement for NGS tests. This was a significant development for clinical laboratories certified to perform the tests because Medicare and Medicaid reimbursement rates often exceed $4,500 per test. As these rates greatly exceed a lab's cost of performing the tests, seemingly overnight, NGS testing became a focus for clinical laboratories across the country.

11. <u>The Labs.</u> BioConfirm and the Unknown Laboratory Defendants are clinical laboratories that provide, *inter alia*, genetic tests utilizing NGS. Defendants either perform these tests at their own facilities or subcontract for other certified laboratories to perform them. For tests sent to other laboratories,

---

[1] Genetic tests utilizing NGS are used to detect genes associated with multiple cancers, cardiac disease, familial hypercholesterolemia, Parkinson's disease, Alzheimers, dementia, and hereditary cardiomyopathies.

4

Defendants pay the subcontracting laboratory a flat fee of no more than $600.00 per test. Defendants then bill governmental and/or private insurers for the same tests at the significantly higher rates.

12. BioConfirm is owned by a Dubaian family that, according to individuals inside that company (and family) is backed by and beholden to offshore financial interests based in Dubai.

13. BioConfirm (and/or the family that owns it) owns and/or controls multiple Unknown Laboratory Defendants, which purportedly number fifty or more. BioConfirm uses the Unknown Laboratory Defendants to disperse its Medicare billing for NGS tests among multiple billers in multiple states. As shown below, the stated purpose behind this multi-lab, multi-state billing strategy is to bill Medicare for many thousands of genetic (and other) tests in a manner calculated: (i) to avoid suspicion of federal regulators and investigators; and (ii) identify the Medicare Administrative Contractor ("MAC") that pays the highest reimbursement rate for each specific test.

14. BioConfirm and the Unknown Laboratory Defendants all possess the requisite credentials to receive Medicare reimbursement for genetic tests utilizing NGS.

15. "Lab X" is one of the laboratories with which BioConfirm subcontracts and/or has sought to subcontract for genetic testing. Lab X possess the requisite credentials required for Defendants to seek Medicare reimbursement for the NGS tests referred to and performed by Lab X.

16. <u>Relator's Knowledge and Sources</u>. Relator is a Lab X employee and part of the company's management team. On multiple occasions within the past year, Relator has communicated directly BioConfirm employees (including management) regarding that company's need for genetic testing and business practices. Other Lab X employees have similarly communicated with BioConfirm employees (including management) and have discussed the content of those communications with Relator. These communications included conversations regarding BioConfirm's methods for generating genetic-testing referrals as well as their strategy for billing Medicare for the tests. Relator and other Lab X employees have also communicated with former BioConfirm employees, as well as individuals and entities presently doing business with BioConfirm.

17. <u>Thousands of Medicare Claims</u>. In his capacity as a Lab X employee, Relator has access to and has reviewed documentation submitted to Lab X by BioConfirm in conjunction with its requisitions for genetic tests. This documentation confirms that, within the past year, BioConfirm has subcontracted

or sought to subcontract for genetic testing for thousands of (alleged) Medicare subscribers, as the majority of test requests included documentation confirming a Medicare Subscriber Identification Number and a Medicare Policy Number for the subject patient. Relator's or other Lab X employees' communications with individuals at BioConfirm further confirmed that either those companies or an Unknown Laboratory Defendant billed Medicare for genetic tests requested for patients with Medicare Subscriber Identification Numbers and a Medicare Policy Numbers.

18. Earlier this year, Lab X employees also communicated with Dr. Aloma Geer, a geneticist who previously worked for BioConfirm and who claimed to still consult with BioConfirm regarding its Medicare and Medicaid billing practices and procedures. Dr. Geer also claimed to be one of the geneticists who verifies to Medicare and Medicaid that BioConfirm's NGS tests are medically necessary. In her communications Lab X employees, Dr. Geer stated that BioConfirm routinely bills and receives payment from Medicare and/or Medicaid for thousands of genetic tests each month.

19. Relator's direct knowledge of BioConfirm's testing data and documentation, as well as his communications with individuals inside the company, indicates that BioConfirm, whether directly or through an Unknown

7

Laboratory Defendant, billed Medicare for at least 40,000 NGS tests since August 2018, and that, as a result, collected from Medicare at least $160,000,000 and likely much more.

20. <u>Thousands of Kickbacks and a Scheme to Deceive</u>. Relator and other Lab X employees are routinely contacted by "marketers" of genetic-test samples. These are entities or individuals who use various strategies to gather genetic-test samples from Medicare subscribers for referral to clinical laboratories that pay the marketers a fee. Marketers often use illegal means to secure test samples from Medicare subscribers, so much so that the Office of Inspector General of the U.S. Department of Health and Human Services recently issued fraud alerts on the subject. Marketer fees are also often illegal violations of the federal Anti-Kickback Statute, especially when they are not fair-market and are properly viewed as payments for test referrals. Many marketers are clinical laboratories that lack the credentials to seek Medicare and Medicaid reimbursement directly and must therefore rely on a credentialed lab like BioConfirm to turn the test samples they generate into profits.

21. With Lab X, the marketer pitch is always the same: while they presently sell their samples to other laboratories that bill Medicare for tests often performed by Lab X or other outside labs, the marketers would like to "cut out the

8

middleman" and deal directly with Lab X on terms more lucrative to both parties. These proposals are illegal, and Lab X does not accept them. But through these interactions, Relator and other Lab X employees encountered multiple marketers who claimed that "their" Medicare-subscriber test samples had previously been sent to Lab X through BioConfirm. One marketer claiming to do business through BioConfirm even presented Lab X with several hundred genetic-test samples and supporting Medicare-subscriber documentation to demonstrate his "good faith." Relator estimates that these test samples represented well over $1,000,000 in potential Medicare reimbursement claims.

22. These and other "red flags" caused Lab X to raise the issues of marketer compensation and test-sample origin with BioConfirm management. During the ensuing conversations, Lab X learned that, for many thousands of genetic tests billed to Medicare:

    a. BioConfirm pays marketers up to $3,000 per test sample with confirmed Medicare-subscriber information, with the specific fee determined primarily by the Medicare reimbursement rates associated with the various tests to be performed;

    b. BioConfirm makes these payments either directly to the marketers or through intermediaries to whom BioConfirm pays inflated fees and/or

salaries with the knowledge that those intermediaries will then use the funds pay the marketers on a per-sample basis;

c. Marketers are not loyal to BioConfirm or any other laboratory but instead refer their test samples to whichever laboratory will pay the most;

d. BioConfirm owns several Unknown Laboratory Defendants across the country that BioConfirm uses to spread out its Medicare billings for NGS tests over multiple labs in multiple regions and thereby hide the true volume of its genetic testing from government regulators and investigators;

e. BioConfirm also uses this multi-lab, multi-region billing strategy to identify and bill the specific MAC most likely to pay the best rate for each particular test; and

23. The marketer compensation that BioConfirm purportedly pays for genetic-test samples and Medicare-subscriber documentation is not fair-market but rather inflated to reflect the referral of business and the high reimbursement rates associated with the tests performed. Indeed, test samples are simply the patients' saliva and the associated paperwork takes minutes to complete. The described payments for test samples are *per se* violations of the federal Anti-Kickback Statute and therefore actionable under the federal False Claims Act.

24. <u>Additional Red Flags</u>. Relator is aware of other issues that support the reasonable inference that Defendants are systematically defrauding Medicare. For example, Lab X has received hundreds and probably thousands of calls from individuals who claim to be the subject patients for NGS tests requested by BioConfirm and who, upon receiving their test results, complain that they did not request and/or provide DNA samples for the tests. There is also an unusually high rate of gender mismatched test results, meaning test samples purportedly from a female are determined to be from a male and vice versa. Additionally, the documentation accompanying tests often lacked referring-physician information, and the patients' family histories that trigger coverage for tests with high reimbursement rates were unusually consistent from patient to patient and lacking the variety one typically sees. And finally, an individual who contracts with BioConfirm regarding its Medicare billing told Lab X employees that BioConfirm, whether directly or through an Unknown Laboratory Defendant, uses improper "stack billing" to maximize Medicare reimbursements.[2]

---

[2] With regard to NGS testing, "stack billing" is the practice of seeking reimbursement using separate billing codes for individual genes in a test panel instead of the single code associated with that panel. Specifically, BioConfirm usually contracts for Lab X to run a test that identifies multiple genes, *i.e.*, a "panel" of genes, but then, rather than bill Medicare using a code specified for that test panel, the company instead uses multiple billing codes associated with separate tests for individual genes that make up the panel. This practice allows BioConfirm

11

25. Accordingly, Relator alleges, on information and belief, that Defendants knowingly submitted, conspired to submit, and/or caused to be submitted claims for Medicare reimbursement for NGS tests for which Defendants knew or were reckless in not knowing involve:

   a. test samples that were not taken from the patient identified in the accompanying paperwork;
   b. tests that were not requested by the patient identified in the accompanying paperwork;
   c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;
   d. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and
   e. incorrect and improper billing codes.

## APPLICABLE LAW

26. The False Claims Act: (i) creates liability for those "who present or directly induce the submission of false or fraudulent claims" to the government; and (ii) "permits, in certain circumstances, suits by private parties on behalf of the United States against [violators]."

---

to increase Medicare revenues by paying Lab X a single flat fee for a test that identifies multiple genes and then billing Medicare as if there were separate tests ordered and performed for each gene.

27. The Anti-Kickback Statute: (i) creates liability for those who "knowingly and willfully offers or pays any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal healthcare program;" and (ii) provides that "a claim that includes items or services resulting from a violation of [the statute] constitutes a false or fraudulent claim for the purposes of [the False Claims Act]."

28. Compliance with the Anti-Kickback Statute is a condition of payment under Medicare and other government healthcare programs and this condition applies regardless of whether the kickback payor or someone else submits the claim to the government. Claims arising from a kickback scheme are *per se* false under the False Claims Act and involve an expressed and/or implied false certification to the government that the submitted claim does not involve a kickback.

29. The Office of Inspector General ("OIG") has issued fraud alerts on clinical laboratory services. In those alerts, OIG stated that "[s]ince the physician, not the patient, generally selects the clinical laboratory, it is essential that the physician's decision regarding where to refer specimens is based only on the best interests of the patient." OIG has advised that "[w]henever a laboratory offers or

13

gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business." Likewise, "whenever a referral source solicits or receives anything of value from a laboratory," a similar inference may be made that the thing of value is sought in exchange for the referral of business. In this analysis, "fair market value" means "value for general commercial purposes," which "must reflect and arm's length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them."

## CLAIMS ASSERTED

30. Relator realleges Paragraphs 1 through 27 as though fully set forth herein.

31. <u>Count One</u>: Defendants violated the federal False Claims Act by submitting claims, or causing the submission of claims, for reimbursement from federal healthcare programs, including Medicare, knowing that the claimant was ineligible for the payments demanded.

32. Claims submitted, or that were caused to be submitted, by the Defendants for clinical laboratory testing that violated the federal Anti-Kickback

Statute constitute violations of the federal False Claims Act, 31 U.S.C. §3729(a)(1).

33. <u>Count Two</u>: Defendants knowingly made, or caused to be made, false statements that were material to false claims, including but not limited to false certifications, whether express or implied, that Defendants had complied with all applicable statutes and regulations required as a condition to receiving payment from federal healthcare programs, including Medicare.

Claims submitted, or that were caused to be submitted, by the Defendants for clinical laboratory testing associated with the express and/or implied false certifications that Defendants had complied with such statutes and regulations constitutes violations of the federal False Claims Act, 31 U.S.C. §3729(a)(1)(B).

<u>Count Three</u>: Defendants, through their concerted efforts to carry out their fraudulent schemes to bill government healthcare programs for false claims for clinical laboratory testing, conspired to defraud the federal government by getting false or fraudulent claims allowed or paid by the government in violation of federal False Claims Act, 31 U.S.C §3729(a)(1)(C).

WHEREFORE, Relator requests the following relief for all claims asserted:

A. Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims, collecting monies for the prior submission of false claims, or in any way violating the federal False Claims Act, 31 U.S.C §3729 *et seq.*;

B. Judgment be entered in favor or Relator and the United States of America against Defendants in the amount of each and every false or fraudulent claim and so multiplied as provided by federal False Claims Act 31 U.S.C. 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500.00) nor more than eleven thousand dollars ($11,000.00) per claim, as provided in 31 U.S.C. §3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the Defendants' scheme, together with penalties allowed for specific claims to be identified at trial after full discovery;

C. Twenty-five percent (25%) of the proceeds of this actions to Relator if the United States of America elects to intervene and thirty percent (30%) if it does not;

D. That judgment be granted for Relator and the United States of America against Defendants for any costs, including but not limited to, costs of court, expert

fees and all attorney's fees incurred by Relators in the prosecution of this lawsuit; and

E. That Relator and the United States of America receive any and all such further relief to which they may be entitled, whether in law or in equity.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, *Qui Tam* Plaintiffs hereby demand a trial by jury.

Dated: Atlanta, Georgia
       October 1, 2019

> Respectfully submitted,
> John P. MacNaughton LLC
>
> By: _____
> John P. MacNaughton
> 2415 Hanover West Lane NW
> Atlanta, GA 30327
> Telephone: (404) 444-9556
> Georgia Bar No. 464550
> John.macnaughtonsr@gmail.com
>
> Of Counsel
>
> Law Offices of Joseph L. Manson, III
> Joseph L. Manson, III
> Benjamin Chernow
> 600 Cameron Street

Alexandria, VA 22314

*Pro Hac Vice* Applications to be filed