

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 0 9 2020

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE UNITED STATES OF AMERICA
ex rel. John Doe,

    *Plaintiff*;    Civil Case No. 1:19-cv-4430-LLM

v.          Jury Trial Demanded

BIOCONFIRM LABORATORIES, LLC;
BIOCONFIRM LABORATORIES USA LLC;
TRI-STATE TOXICOLOGY, LLC; EXPRESS
DIAGNOSTICS LLC; TOX MANAGEMENT, LLC;
FT BUYER, LLC; SPECIALTY SCREENING LLC;
GENETIC TESTING LABORATORY; INFINITY
DIAGNOSTIC LABORATORY INC.; SIGNIFY
LABORATORY, LLC, SUMMIT CLINICAL
LABORATORY LLC; BIO CHOICE
LABORATORY, INC.; DTR LABS LLC;
LEHIGH VALLEY GENOMICS; FIRST CHOICE
LABORATORY LLC; OXY-GEN LABORATORY LLC;
ALTRU DIAGNOSTICS, INC.; PLS SCIENTIFIC, LLC;
OPTEO LABORATORY, LLC; PURE DIAGNOSTIC LLC;
BOCA TOXICOLOGY, LLC; ELITE MEDICAL
LABORATORY SOLUTIONS LLC;
CERGENA LABORATORY, LLC; LABS2RUN, INC.;
LAVACA PRIMARY HEALTH SYSTEMS, LLC;
BEBD TELEHEALTH LLC; BLUE WATER DIAGNOSTICS;
MY DOCTOR'S LIVE, LLC; RCE HOLDINGS, LLC;
UNKNOWN LABORATORIES Nos. 1 – 50; AYMAN
MUSTAFA; MOHAMAD MUSTAFA; REYAD
SALAHALDEEN; DONOVAN BROWN; REGINAL VINES;
DR. VINIT PATEL; SAM HAMADA; EDWARD KLAPP;
SUSAN BRADDOCK; KEVIN KEAN; AL KNOWLES;

1

DANIEL HURT; and JOHN SPIVEY,

                *Defendants*.

## FIRST AMENDED COMPLAINT

## [AMENDED PURSUANT TO FED. R. CIV. P. 15(a)(1)]

## [FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)]

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, by and through the *qui tam* Relator, John Doe,

brings this action under 31 U.S.C. § 3729, *et seq*., (the "False Claims Act" or "FCA")

to recover civil damages, penalties and attorney fees from Defendants.

## PARTIES

1. Plaintiff is the United States of America.

2. Relator is an individual and citizen of the United States of America.

Relator files this action under the pseudonym "John Doe."

3. BioConfirm Laboratories, LLC is a Georgia limited liability company

with a primary place of business at 6755 Peachtree Industrial Blvd., Doraville, GA

30360. BioConfirm Laboratories, LLC's registered agent for service of process is

M. Todd Westfall, 3101 Towercreek Pky., Suite 600, Atlanta, GA 30339.

4. BioConfirm Laboratories USA LLC is a Georgia limited liability

company with a primary place of business at 6755 Peachtree Industrial Blvd., Ste.

150, Doraville, GA 30360. BioConfirm Laboratories USA LLC's registered agent

for service of process is Mohamad Mustaf, 6755 Peachtree Industrial Blvd., Ste. 150,

Doraville, GA 30360. Upon information and belief, BioConfirm Laboratories, LLC

and BioConfirm Laboratories USA LLC are, for all practical purposes, the same

entity (hereinafter collectively "BioConfirm").

3

5. Unknown Laboratories Nos. 1 through 50 (the "Unknown Laboratory Defendants") are presently unidentified clinical laboratories located throughout the United States. On information and belief, BioConfirm and/or the families who own BioConfirm own and/or control the Unknown Laboratory Defendants and use them to bill Medicare for the genetic tests and other tests at issue in this lawsuit.

6. Tri-State Toxicology, LLC is a Texas limited liability company with a primary place of business at 424 West Nakoma St., San Antonio, TX 78216. Tri-State Toxicology, LLC's registered agent for service of process is Brandon Gomez, 424 West Nakoma St., San Antonio, TX 78216. Tri-State Toxicology, LLC operates the laboratory Definitive DX at 424 West Nakoma St., San Antonio, TX 78216.

7. Tox Management, LLC is a Texas limited liability company with a primary place of business at 422 West Nakoma St., San Antonio, TX 78612. Tox Management, LLC's registered agent for service of process is Mary Ann Garcia, 422 West Nakoma St., San Antonio, TX 78612. Tox Management, LLC operates the laboratory Accurate DX at 422 West Nakoma St., San Antonio, TX 78612.

8. Express Diagnostics LLC is a New Jersey limited liability company with a primary place of business at 4 Cornwall Drive, Ste. 101, East Brunswick, NJ 08816. Express Diagnostic LLC's registered agent for service of process is Andrea Hernandez at 4 Cornwall Drive, Ste. 101, East Brunswick, NJ 08816. Express

4

Diagnostic LLC operates the laboratory Express Diagnostics at 4 Cornwall Drive, Ste. 101, East Brunswick, NJ 08816.

9.     FT Buyer, LLC is a Delaware limited liability company with a primary place of business at 1105 Southview Ln. # 103-140, Tuscaloosa, AL 35405. FT Buyer, LLC's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, DE 19801. FT Buyer, LLC operates the laboratory Dynasty R&D Diagnostics at 2825 Miller Ranch Rd, Ste. 221, Pearland, TX 77584.

10.     Specialty Screening LLC is a Wisconsin limited liability company with a principal place of business at 10111 W. Capitol Dr., Ste. 3, Wauwatosa, WI 53222. Specialty Screening LLC's registered agent for service of process is Reginal Vines, 10111 W. Capitol Dr., Ste. 3, Wauwatosa, WI 53222. Specialty Screening LLC operates the laboratory Specialty Screening at 7620 W. Burleigh St. Milwaukee, WI 53222.

11.     Genetic Testing Laboratory is a California company with a primary place of business at 18 Technology Dr., Ste. 107, Irvine, CA 92618. Genetic Testing Laboratory's registered agent for service of process is Sam Kabbani, 3848 Del Amo Blvd., Ste. 303, Torrance, CA 90503. Genetic Testing Laboratory operates the

5

laboratory Advanced Testing in Clinical Genetics (ATCG) at 18 Technology Dr., Ste. 107, Irvine, CA 92618.

12.     Infinity Diagnostic Laboratory Inc. is a New Jersey Company with a primary place of business at 370 North Street, Teterboro, NJ 07608. Infinity Diagnostic Laboratory Inc.'s registered agent for service of process is Joseph Loevy, 370 North Street, Teterboro, NJ 07608. Infinity Diagnostic Laboratory Inc. operates the laboratory Infinity Diagnostic Laboratory at 370 North Street, Teterboro, NJ 07608.

13.     Signify Laboratory, LLC is a Louisiana limited liability company with a primary place of business at 935 Gravier Street, Ste. 520, New Orleans, LA 70112. Signify Laboratory, LLC's registered agent for service of process is Matthew Almon, 909 Poydras, Street, Ste. 3150, New Orleans, LA 70112. Signify Laboratory, LLC operates the laboratory Signify Laboratory, LLC at 935 Gravier Street, Ste. 550, New Orleans, LA 70112.

14.     Opteo Laboratory, LLC is a Louisiana limited liability company with a primary place of business at 935 Gravier Street, Ste. 520, New Orleans, LA 70112. Opteo Laboratory, LLC's registered agent for service of process is Matthew Almon, 909 Poydras, Street, Ste. 3150, New Orleans, LA 70112. Opteo Laboratory, LLC

6

operates the laboratory Opteo Laboratory at 1441 Canal Street, Ste. 401, New Orleans, LA 70112.

15.     Cergena Laboratory, LLC is a Louisiana limited liability company with a primary place of business at 935 Gravier Street, Ste. 520, New Orleans, LA 70112. Cergena Laboratory, LLC's registered agent for service of process is Matthew Almon, 909 Poydras, Street, Ste. 3150, New Orleans, LA 70112. Upon information and belief, Cergena Laboratory, LLC is, for all practical purposes, the same entity as Cergena Laboratories, LLC, a Delaware limited liability company with a primary place of business at 935 Gravier Street, Ste. 540, New Orleans, LA 70112. Cergena Laboratories, LLC's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, DE 19801. Upon further information and belief, both Cergena Laboratory, LLC and Cergena Laboratories, LLC are related to Cergena Laboratory, LLC a Delaware limited liability company with a registered agent for service of process at The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, DE 19801 (hereinafter Cergena Laboratory, LLC, Cergena Laboratories, LLC and Cergena Laboratory, LLC are collectively referred to as "Cergena").

16.     Summit Clinical Laboratory LLC is a Texas limited liability company with a principal place of business at 17742 Preston Rd., #205, Dallas, TX 75252.

7

Summit Clinical Laboratory LLC's registered agent for service of process is United States Corporation Agents, Inc., 9900 Spectrum Drive, Austin, TX 78717. Summit Clinical Laboratory LLC operates the laboratory Summit Clinical Laboratory LLC at 2000 Glen Echo Rd., Ste. 105, Nashville TN 37215.

17.     Bio Choice Laboratory, Inc. is a Texas company with a primary place of business at 7505 St., Ste. 333, Houston, TX 77054. Bio Choice Laboratory, Inc.'s registered agent for service of process is Mini Vetticadan, 3245 Reid Dr., Corpus Christi, TX 78404. Bio Choice Laboratory, Inc. assumed the name US Genomix on January 27, 2020. Bio Choice Laboratory, Inc. operates the laboratory BioChoice Laboratory at 3245 Reid Dr., Ste. B, Corpus Christi, TX 78404.

18.     DTR Labs LLC is a Texas limited liability company with a primary place of business at 2150 Justin Rd., Ste. 300, Highland Village, TX 75077. DTR Labs LLC's registered agent for service of process is Trent Allison, 2150 Justin Rd., Ste. 300, Highland Village, TX 75077. DTR Labs LLC operates the laboratory DTR Labs, LLC at 2150 Justin Rd., # 300, Highland Village, TX 75077.

19.     Lehigh Valley Genomics is a Pennsylvania company with a primary place of business at 3864 Courtney Street, Ste. 150, Bethlehem, PA 18017. Pennsylvania does not utilize registered agents, and Lehigh Valley Genomics can be served with process at 3864 Courtney Street, Ste. 150, Bethlehem, PA 18017. Lehigh

8

Valley Genomics operates the laboratory Lehigh Valley Genomics at 3864 Courtney Street, Ste. 150, Bethlehem, PA 18017.

20.    First Choice Laboratory LLC is a Florida limited liability company with a primary place of business at 6061 NE 14th Ave., Fort Lauderdale, FL 33334. First Choice Laboratory LLC's registered agent for service of process is Russell Kitchen, 2657 NE 37th Drive, Fort Lauderdale, FL 33308. First Choice Laboratory, LLC runs the laboratory First Choice Laboratory at 6061 NE 14th Ave., Fort Lauderdale, FL 33334.

21.    Oxy-Gen Laboratory LLC is a Georgia limited liability company with a primary place of business at 5680 Oakbrook Pkwy Ste. 100, Norcross, GA, 30093. Oxy-Gen Laboratory LLC's registered agent for service of process is Jean-Francois Toure, 2610 Trees of Avalon Pkwy, McDonough, GA 30253. Oxy-Gen Laboratory LLC operates the laboratory Oxy-Gen Laboratory at 5680 Oakbrook Pkwy Ste. 100, Norcross, GA, 30093.

22.    Altru Diagnostics, Inc. is a Texas company with a primary place of business at 8562 Katy Freeway, Ste. 152, Houston, TX 77024. Altru Diagnostic, Inc.'s registered agent for service of process is Jesse Howard, 5409 Gibson St., Houston, TX 77007. Altru Diagnostics, Inc. operates the laboratory Altru Diagnostics at 8562 Katy Freeway, Ste. 152, Houston, TX 77024.

9

23. PLS Scientific, LLC is an Oklahoma limited liability company with a primary place of business at 1415 N. Watts St., Sayre, OK 73662. PLS Scientific, LLC's registered agent for service of process is Stephanie Robison, 1415 N. Watts St., Sayre, OK 73662. PLS Scientific, LLC operates the laboratory PLS Scientific at 1415 N. Watts St., Sayre, OK 73662.

24. Pure Diagnostic LLC is a Georgia limited liability company with a primary place of business at 4025 Pleasantdale Rd, Ste. 525, Doraville, GA, 30340. Pure Diagnostic LLC's registered agent for service of process is Ozzie Elbdour, 4025 Pleasantdale Rd, Ste. 525, Doraville, GA, 30340. Pure Diagnostic LLC operates the laboratory Pure Diagnostic at 4025 Pleasantdale Rd, Building 500 Ste. 525, Doraville, GA 30340.

25. Boca Toxicology, LLC is a Florida limited liability company with a primary place of business at 3280 N. Federal Hwy., Boca Raton, FL 33431. Boca Toxicology, LLC's registered agent for service of process is Incorp Services, Inc., 17888 67th Court North, Loxahatchee, FL 33470. Boca Toxicology, LLC operates the laboratory Laboratory Dynamics at 3280 N. Federal Hwy., Boca Raton, FL 33431.

26. Elite Medical Laboratory Solutions LLC is a Texas limited liability company with a primary place of business at 1101 Alma St., Ste. 108, Tomball, TX

10

77375. Elite Medical Laboratory Solutions LLC's registered agent for service of process is Kearney, McWilliams & Davis, PLLC, 55 Waugh #150, Houston, TX 77007. Elite Medical Laboratory Solutions LLC operates the laboratory Diax Labs at 1101 Alma St., Ste. 100, Tomball, TX 77375.

27. Labs2Run, Inc. ("Labs2Run") is a Texas company with a primary place of business at 2050 N. Collins Blvd., Ste. 104, Richardson, TX 75080. Labs2Run's registered agent for service of process is Asif Qamar, 2050 N. Collins Blvd., Ste. 104, Richardson, TX 75080.

28. Lavaca Primary Health Systems, LLC is a Delaware limited liability company with a primary place of business at 1105 Southview Ln. # 103-140 Tuscaloosa, AL 35405. Lavaca Primary Health Systems, LLC's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center 1209 Orange St., Wilmington, DE 19801.

29. BEBD Telehealth LLC ("BEBD") is a Texas corporation with a primary place of business at 2009 Tremont Ave., Fort Worth, TX 76107. BEBD's registered agent for service of process is Susan Braddock, 2009 Tremont Ave., Fort Worth, TX 76107.

30. Blue Water Diagnostics is a Wyoming corporation with a principal place of business 306 Chambord Terrace, Palm Beach Gardens, FL 33410. Blue

11

Water Diagnostic's registered agent for service of process is Wyoming EZ Corp.,
2232 Dell Range Blvd., Ste. 245, Cheyenne, WY 82009.

31.    My Doctor's Live, LLC is a Florida limited liability company with a
primary place of business at 170 Fitzgerald Rd., Ste. 1, Lakeland, FL 33813. My
Doctor's Live, LLC's registered agent for service of process is Rose Rossiter, 4501
Nesmith Rd., Plant City, FL 33567. My Doctor's Live, LLC owns and/or operates
the tele-medicine company My Specialist MD.

32.    RCE Holdings, LLC is a Florida limited liability company with a
primary place of business at 170 Fitzgerald Rd., Ste. 1, Lakeland, FL 33813. RCE
Holdings, LLC's registered agent for service of process is Stephen Rossiter, 4501
Nesmith Rd., Plant City, FL 33567. RCE Holdings, LLC owns and/or operates the
tele-medicine company RCE Live.

33.    Reyad Salahaldin ("Salahaldin") is an individual who, on information
and belief, resides at 3166 Camp Branch Rd., Buford, Ga 30519 and/or at 104 Pin
Oak Court, Greenville, NC 27858. On information and belief, Salahaldin may also
spell his last name "Salahaldeen".

34.    Mohamad Mustafa ("M. Mustafa") is an individual whose address is
unknown but who is defendant BioConfirm's Georgia registered agent at the
following address: 6755 Peachtree Industrial Blvd., Ste. 150, Doraville, GA 30360.

12

35.    Ayman Mustafa ("A. Mustafa") is an individual who, on information and belief, resides at an unknown address in Dubai and is the father of defendant Mohamad Mustafa.

36.    Reginal Vines ("Vines") is an individual whose address is unknown but who is defendant Specialty Screening, LLC's Wisconsin registered agent at the following address: 10111 W. Capitol Dr., Ste. 3, Wauwatosa, WI 53222.

37.    Donovan Brown ("Brown") is an individual whose address is unknown but who owns and/or operates defendant Lavaca Primary Health Systems, LLC from the following address: 1105 Southview Ln. # 103-140, Tuscaloosa, AL 35405.

38.    Dr. Vinit Patel ("Dr. Patel") is an individual who, on information and belief, resides at 991 Lake Crest Pkwy., Hoover, AL. Upon information and belief Dr. Patel operates a medical practice from the following address: 1515 6th Ave S., Birmingham, AL 35233.

39.    Sam Hamada ("Hamada") is an individual with an unknown address in Alabama and, who on information and belief, is a marketing representative who works with D. Patel. On information and belief, Hamada may also spell his last name "Hamedeh."

40.    Edward Klapp ("Klapp") is an individual who, on information and belief, resides at 1080 E. Indiantown Road, Ste. 100, Jupiter, FL, 33477.

13

41. Susan Braddock ("Braddock") is an individual whose address is unknown but who is defendant BEBD's Texas registered agent at the following address: 2009 Tremont Ave., Fort Worth, TX 76107.

42. Kevin Kean ("Kean") is an individual who, on information and belief, resides at 210 E. Flamingo Rd., Las Vegas, NV 89109.

43. Al Knowles ("Knowles") is an individual who, on information and belief, resides at 127 Carteret Pl., Decatur, GA 30032.

44. Daniel Hurt ("Hurt") is an individual whose address is unknown but who operates defendant First Choice Laboratory LLC at the following address: 6061 NE 14th Ave., Fort Lauderdale, FL 33334.

45. John Spivey ("Spivey") is an individual whose address is unknown but who is the sole officer of Summit Health Strategies, LLC. Summit Health Strategies, LLC is a Louisiana limited liability company with a principal place of business at 935 Gravier Street, Ste. 540, New Orleans, LA 70112. Upon information and belief, Summit Health Strategies, LLC is, for all practical purposes, the same entity as Summit Healthcare Strategies, LLC. Summit Healthcare Strategies, LLC is a Delaware limited liability company with a primary place of business at 935 Gravier Street, Ste. 520, New Orleans, LA 70112 (hereinafter Summit Health Strategies,

14

LLC and Summit Healthcare Strategies, LLC are collectively referred to as "SummitHS").

## JURISDICTION AND VENUE

46.     This Court has subject-matter jurisdiction over this action pursuant to 31 U.S.C. §3732(a) (False Claims Act) and 28 U.S.C §1331 (Federal Question).

47.     Venue is proper in this Court under 28 U.S.C §1391(b) and/or 31 U.S.C. §3732(a) because: (i) one or more defendants can be found, reside, or transact business in this judicial district: (ii) one or more acts proscribed by 31 U.S.C. §3732 occurred in this district; and (iii) a substantial part of the events or omissions giving rise to the asserted claims occurred in this district.

48.     The facts and circumstances of the defendants' FCA violations described herein have not been publicly disclosed, including in: (i) a criminal, civil, or administrative hearing, (ii) a congressional, administrative, General Accounting Office, or Auditor General report, hearing, audit, or investigation; or (iii) the news media.

49.     Relator is the original source of the information upon which this First Amended Complaint is based, as that phrase is used in the False Claims Act, and he has provided disclosures of the allegations made herein to the United States prior to filing.

## FACTUAL BACKGROUND

50.     The Tests. Next Generation Sequencing ("NGS") is a DNA sequencing technology that allows for the quick and cost-effective sequencing of an individual's genome. It is a new technology, and it enables healthcare providers to better: (i) assess a patient's risk of certain hereditary diseases and medication side effects; and (ii) predict the likely success of a particular treatment.[1]

51.     In 2018, the Centers for Medicare & Medicaid Services ("CMS") expanded the circumstances for Medicare and Medicaid reimbursement for NGS tests. This was a significant development for clinical laboratories certified to perform the tests because Medicare and Medicaid reimbursement rates often exceed $4,500 per test. As these rates greatly exceed a lab's cost of performing the tests, seemingly overnight, NGS testing became a focus for clinical laboratories across the country.

52.     The BioConfirm Labs. BioConfirm and the Unknown Laboratory Defendants are clinical laboratories that provide, *inter alia*, genetic tests utilizing NGS. These defendants either perform these tests at their own facilities or subcontract for other certified laboratories to perform them. For tests sent to other laboratories, BioConfirm and the Unknown Laboratory Defendants pay the

_____

[1] Genetic tests utilizing NGS are used to detect genes associated with multiple cancers, cardiac disease, familial hypercholesterolemia, Parkinson's disease, Alzheimers, dementia, and hereditary cardiomyopathies.

16

subcontracting laboratory a flat fee of no more than $600.00 per test. BioConfirm and the Unknown Laboratory Defendants then bill governmental and/or private insurers for the same tests at the significantly higher rates.

53.     BioConfirm is owned and/or managed by the defendants A. Mustafa, M. Mustafa, and Salahaldin (collectively the "Individual BioConfirm Defendants"), who collectively controlled and orchestrated BioConfirm's scheme to defraud the United States through the filing of false claims.

54.     BioConfirm (and/or the Individual BioConfirm Defendants) owns and/or controls multiple Unknown Laboratory Defendants, which purportedly number fifty or more. BioConfirm used the Unknown Laboratory Defendants to disperse its Medicare billing for NGS tests among multiple billers in multiple states. As shown below, the stated purpose behind this multi-lab, multi-state billing strategy is to bill Medicare for many thousands of genetic (and other) tests in a manner calculated: (i) to avoid suspicion of federal regulators and investigators; and (ii) identify the Medicare Administrative Contractor ("MAC") that pays the highest reimbursement rate for each specific test.

55.     BioConfirm and the Unknown Laboratory Defendants all possess the requisite credentials to receive Medicare reimbursement for genetic tests utilizing NGS.

17

56.     "Lab X" is one of the several laboratories with which BioConfirm subcontracts and/or has sought to subcontract for genetic testing. Lab X possesses the requisite credentials required for BioConfirm to seek Medicare reimbursement for the NGS tests referred to and performed by Lab X.

57.     Relator's BioConfirm Knowledge and Sources. Relator is a Lab X employee and part of the company's management team. On multiple occasions in the year preceding this lawsuit and afterwards, Relator communicated directly with BioConfirm employees (including management) regarding that company's need for genetic testing and business practices. Other Lab X employees similarly communicated with BioConfirm employees (including management) and discussed the content of those communications with Relator. These communications included conversations regarding BioConfirm's methods for generating test referrals as well as their strategy for billing Medicare for the tests. Relator and other Lab X employees have also communicated with former BioConfirm employees, as well as individuals and entities that did business with BioConfirm.

58.     Thousands of Medicare Claims. In his capacity as a Lab X employee, Relator has access to and has reviewed documentation submitted to Lab X by BioConfirm in conjunction with its requisitions for genetic tests. This documentation confirms that, from at least the end of 2018, BioConfirm subcontracted or sought to

18

subcontract for genetic testing for thousands of (alleged) Medicare subscribers, as the majority of test requests included documentation confirming a Medicare Subscriber Identification Number and a Medicare Policy Number for the subject patient. Relator's or other Lab X employees' communications with individuals at BioConfirm further indicate that either BioConfirm or an Unknown Laboratory Defendant billed Medicare for genetic tests requested for patients with Medicare Subscriber Identification Numbers and a Medicare Policy Numbers.

59.    Lab X employees also communicated with Dr. Aloma Geer, a geneticist who previously worked for BioConfirm and who claimed to still consult with BioConfirm regarding its Medicare and Medicaid billing practices and procedures. Dr. Geer claimed to be one of the geneticists who verified to Medicare and Medicaid that BioConfirm's NGS tests were medically necessary. In her communications with Lab X employees, Dr. Geer stated that BioConfirm routinely billed and received payment from Medicare and/or Medicaid for thousands of genetic tests each month.

60.    Relator's direct knowledge of BioConfirm's testing data and documentation, as well as his communications with individuals inside the company, indicates that BioConfirm, whether directly or through an Unknown Laboratory Defendant, billed Medicare for at least 40,000 NGS tests since August 2018, and

that, as a result, collected from Medicare at least $160,000,000 and likely much more.

61.    Thousands of Kickbacks and a Scheme to Deceive.    Relator and other Lab X employees are routinely contacted by "marketers" of genetic-test samples. These are entities or individuals who use various strategies to gather genetic-test samples from Medicare subscribers for referral to clinical laboratories that pay the marketers a fee. Marketers often use illegal means to secure test samples from Medicare subscribers, so much so that the Office of Inspector General of the U.S. Department of Health and Human Services has issued fraud alerts on the subject. Marketer fees are also often illegal violations of the federal Anti-Kickback Statute, especially when they are not fair-market and are properly viewed as payments for test referrals. Many marketers are clinical laboratories that lack the credentials to seek Medicare and Medicaid reimbursement directly and must therefore rely on a credentialed lab like BioConfirm to turn the test samples they generate into profits.

62.    When they approach Lab X, the marketer pitch is always the same: while they presently sell their samples to other laboratories that bill Medicare for tests often performed by Lab X or other outside labs, the marketers would like to "cut out the middleman" and deal directly with Lab X on terms more lucrative to both parties. These proposals are illegal, and Lab X does not accept them. But

20

through these interactions, Relator and other Lab X employees encountered multiple marketers who claimed that "their" Medicare-subscriber test samples had previously been sent to Lab X through BioConfirm. One marketer claiming to do business through BioConfirm even presented Lab X with several hundred genetic-test samples and supporting Medicare-subscriber documentation to demonstrate his "good faith." Relator estimates that these test samples represented well over $1,000,000 in potential Medicare reimbursement claims.

63.    These and other "red flags" caused Lab X to raise the issues of marketer compensation and test-sample origin with BioConfirm management. During the ensuing conversations, Lab X learned that, for many thousands of genetic tests billed to Medicare:

- a. BioConfirm pays marketers up to $3,000 per test sample with confirmed Medicare-subscriber information, with the specific fee determined primarily by the Medicare reimbursement rates associated with the various tests to be performed;

- b. BioConfirm makes these payments either directly to the marketers or through intermediaries to whom BioConfirm pays inflated fees and/or salaries with the knowledge that those intermediaries will then use the funds pay the marketers on a per-sample basis;

21

c. Marketers are not loyal to BioConfirm or any other laboratory but instead refer their test samples to whichever laboratory will pay the most;

d. BioConfirm owns several Unknown Laboratory Defendants across the country that BioConfirm uses to spread out its Medicare billings for NGS tests over multiple labs in multiple regions and thereby hide the true volume of its genetic testing from government regulators and investigators;

e. BioConfirm also uses this multi-lab, multi-region billing strategy to identify and bill the specific MAC most likely to pay the best rate for each particular test; and

64. The marketer compensation that BioConfirm purportedly pays for genetic-test samples and Medicare-subscriber documentation is not fair-market but rather inflated to reflect the referral of business and the high reimbursement rates associated with the tests performed. Indeed, test samples are simply the patients' saliva and the associated paperwork takes minutes to complete. The described payments for test samples are *per se* violations of the federal Anti-Kickback Statute and therefore actionable under the federal False Claims Act.

65. Relator's communication with other Lab X employees and individuals within BioConfirm further indicates that BioConfirm uses the same fraudulent scheme to seek Medicare reimbursements for a wide variety of tests, including but not limited to tests related to pharmacogenomics (PGX), hereditary cancer screening (CGX), expanded carrier screening (ECS), hereditary cardiovascular disease, diabetes, and obesity.

66. Additional Red Flags. Relator is aware of other issues that support the reasonable inference that BioConfirm is systematically defrauding Medicare. For example, Lab X has received hundreds (and probably thousands) of calls from individuals who claim to be the subject patients for NGS tests requested by BioConfirm and who, upon receiving their test results, complain that they did not request and/or provide DNA samples for the tests. There is also an unusually high rate of gender mismatched test results, meaning test samples purportedly from a female are determined to be from a male and vice versa. Multiple tests purportedly from a single patient similarly evidenced different DNA, meaning the samples were not collected from the same subject.[2] The documentation accompanying tests often

---

[2] Relator understands that Medicare reimbursements are limited for multiple tests collected from a patient on the same day. The paperwork typically submitted with multiple BioConfirm test samples for an individual patient often show that the samples were each collected on different days, one after the other, which is unusual.

lacked referring-physician information, and the patients' family histories that trigger coverage for tests with high reimbursement rates were unusually consistent from patient to patient and lacking the variety one typically sees. And finally, an individual who contracts with BioConfirm regarding its Medicare billing told Lab X employees that BioConfirm, whether directly or through an Unknown Laboratory Defendant, uses improper "stack billing" to maximize Medicare reimbursements.3

67.    Accordingly, Relator alleges, on information and belief, that BioConfirm, the Individual BioConfirm Defendants, and the Unknown Laboratory Defendants, knowingly submitted, conspired to submit, and/or caused to be submitted, claims for Medicare reimbursement for NGS tests and other tests for which they knew or were reckless in not knowing involve:

      a. test samples that were not taken from the patient identified in the accompanying paperwork;

---

3 With regard to NGS testing, "stack billing" is the practice of seeking reimbursement using separate billing codes for individual genes in a test panel instead of the single code associated with that panel. Specifically, BioConfirm usually contracts for Lab X to run a test that identifies multiple genes, *i.e.*, a "panel" of genes, but then, rather than bill Medicare using a code specified for that test panel, the company instead uses multiple billing codes associated with separate tests for individual genes that make up the panel. This practice allows BioConfirm to increase Medicare revenues by paying Lab X a single flat fee for a test that identifies multiple genes and then billing Medicare as if there were separate tests ordered and performed for each gene.

b. tests that were not requested by the patient identified in the accompanying paperwork;

c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;

d. test samples the were acquired by illegal kickback payments;

e. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and/or

f. incorrect and improper billing codes;

68. The Clio Raid: In September 2019, federal authorities raided Clio Laboratories ("Clio") in Lawrenceville, Georgia. Clio is the clinical laboratory upon which BioConfirm was modeled. Clio and BioConfirm are separately owned by two families related by marriage, with one family owning Clio and the other owning BioConfirm. According to individuals who formerly worked inside Clio and BioConfirm, the two families are both backed by and beholden to offshore financial interests. Those same individuals further confirmed to Relator that, although both companies employed the same practice of illegally paying marketers for Medicare test referrals, the two families operated Clio and BioConfirm independently from each other, *i.e.*, they shared neither management, employees, nor assets.

69. BioConfirm Shuts Down: The Clio raid and related criminal indictments did not touch BioConfirm or the Individual BioConfirm Defendants. Even so, BioConfirm abruptly stopped sending out NGS samples for testing. From Relator's conversations with a Lab X employee in direct communication with one or more of the Individual BioConfirm Defendants, Relator learned that: (i) after a brief pause in operations, the Individual BioConfirm Defendants intended to cautiously resume BioConfirm's testing volume but through different, newly acquired laboratories; and (ii) many of the marketers who sold Medicare referrals had abandoned BioConfirm and the Individual BioConfirm Defendants in favor of other labs lacking ties to Clio and offering the next highest price for referrals.

70. The Heirs of BioConfirm: Relator's observations within Lab X and conversations other Lab X employees indicates that, following the Clio raid, the Individual BioConfirm Defendants resumed submitting Medicare-subscriber test samples through at least three labs:

Definitive DX

Express Diagnostics

Accurate DX

71. These labs may have been used as Unknown Laboratory Defendants, although Relator understands that they were acquired after the Clio raid. On

26

information and belief, Relator alleges the Individual BioConfirm Defendants, these labs, and possibly others knowingly submitted, conspired to submit, and/or caused to be submitted, claims for Medicare reimbursement for NGS tests and other tests for which they knew or were reckless in not knowing involve:

 a. test samples that were not taken from the patient identified in the accompanying paperwork;

 b. tests that were not requested by the patient identified in the accompanying paperwork;

 c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;

 d. tests acquired by illegal kickback payments;

 e. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and/or

 f. incorrect and improper billing codes;

72. The Known Laboratory Defendants: Relator's observations within Lab X, conversations other Lab X employees, and/or conversations with individuals at other clinical laboratories indicate that, shortly after the Clio raid, the following laboratories began processing Medicare referrals previously sent to BioConfirm:

27

Dynasty R&D Diagnostics ("Dynasty")

Specialty Screening ("Specialty")

ACTG (Advanced Testing and Clinical Genetics) ("ACTG")

Infinity Diagnostics ("Infinity")

Signify Laboratory, LLC ("Signify")

Summit Clinical Laboratory LLC ("Summit")

BioChoice Laboratory (aka US Genomix)

DTR Labs, LLC

Lehigh Valley Genomics

First Choice Laboratory ("First Choice")

Oxy-Gen Laboratory

Altru Diagnostics

PLS Scientific

Opteo Laboratory ("Opteo")

Pure Diagnostics

Laboratory Dynamics

Diax Labs

(collectively, the "Independent Laboratory Defendants").

28

73. On information and belief, the Independent Laboratory Defendants are either: (i) coordinating with the Individual BioConfirm Defendants; or (ii) independently paying marketers for redirected BioConfirm referrals. Relator's observations within Lab X, conversations with other Lab X employees, and conversations with individuals at other labs indicate that, after the Clio raid, these laboratories began processing Medicare-subscriber test samples with BioConfirm test requisitions that predated the Clio raid. These samples and associated paperwork generally included all of the "red flags" observed with the testing previously done for BioConfirm. On information and belief, Relator alleges that the Independent Laboratory Defendants knowingly submitted, conspired to submit, and/or caused to be submitted, claims for Medicare reimbursement for NGS tests and other tests for which they knew or were reckless in not knowing involve:

> a. test samples that were not taken from the patient identified in the accompanying paperwork;
>
> b. tests that were not requested by the patient identified in the accompanying paperwork;
>
> c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;
>
> d. tests acquired by illegal kickback payments;

e. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and/or

f. incorrect and improper billing codes.

74. The Lavaca Defendants: Brown and Vines do business as or through Lavaca Medical Management Services, which Realtor alleges, on information and belief, is an assumed name of Lavaca Primary Health Systems, LLC ("Lavaca") (collectively, the "Lavaca Defendants"). Lavaca claims to be a Tuscaloosa-based laboratory-management company overseeing various clinical laboratories. These laboratories include Independent Laboratory Defendants Dynasty, Specialty, and ACTG (the "Lavaca Labs"), all of which began processing Medicare-subscriber test samples with BioConfirm requisitions after the Clio raid.

75. Relator's observations within Lab X, conversations with other Lab X employees, and conversations with individuals at other labs indicate that Brown, Vines, and others working with or through Lavaca and its associated labs knowingly facilitated or managed efforts to defraud Medicare. As with BioConfirm, Lab X and other labs experienced significant irregularities and "red flags" with Medicare-subscriber samples and requisitions submitted by the Lavaca Labs. Among other things, an individual with another lab with significant dealings with Brown, Vines,

and the Lavaca Labs explicitly warned Relator that: (i) the results of the Lavaca Labs' test samples routinely did not match patient information on the accompanying requisitions; (ii) it was often impossible to verify patient information on Lavaca Lab requisitions; (iii) the Lavaca Labs relied significantly on tests authorized by Dr. Patel, an Alabama ER doctor who previously authorized thousands of Clio and BioConfirm tests; (iv) the Lavaca Labs Medicare referrals came in significant part from Hamada, a marketer who had previously referred thousands of tests to Clio and BioConfirm; (v) a significant number of the Lavaca Labs requisitions appeared to be filled out in the same handwriting, which included patient signatures of only the patient's initials; and (vi) many patients appeared to be recycled from prior tests of different varieties performed years ago for different laboratories. Relator confirmed these observations through Lab X's dealings with the Lavaca Labs and prior dealings with BioConfirm. Relator is also aware of telephone conference calls that included Brown and Vines wherein Brown described how the Lavaca Labs modified test requisitions.

76. On information and belief, Relator alleges that the Lavaca Defendants, Patel and Hamada (through the Lavaca Labs, BioConfirm, and possibly other labs), and possibly other labs associated therewith knowingly submitted, conspired to

31

submit, and/or caused to be submitted, claims for Medicare reimbursement for NGS tests and other tests for which they knew or were reckless in not knowing involve:

> a. test samples that were not taken from the patient identified in the accompanying paperwork;
>
> b. tests that were not requested by the patient identified in the accompanying paperwork;
>
> c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;
>
> d. tests acquired by illegal kickback payments;
>
> e. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and/or
>
> f. incorrect and improper billing codes.

77.    The Blue Water Defendants: Klapp is CEO of Blue Water Diagnostics ("Blue Water"). Relator is aware of conversations wherein Klapp boasted about sending tens of thousands of Medicare/Medicaid referrals a month to Clio and BioConfirm. Lab X's experience and Relator's conversations with individuals at other labs indicate that Klapp and Blue Water continue to provide such referrals to other labs, including defendants Specialty, Dynasty, and Labs2Run. Relator is

32

further aware of conversations wherein Klapp described how: (i) "his samples" were spread out among different labs, which often required requisitions and patient consents to be modified from the form originally executed by the patient; (ii) Klapp and Blue Water generate referrals by contracting with BEBD, a tele-med marketing company where BEBD is an acronym for Big Easy Big Dog.

78. On information and belief, Relator alleges that the Klapp, Blue Water, Labs2Run, and possibly other labs associated therewith knowingly submitted, conspired to submit, and/or caused to be submitted claims for Medicare reimbursement for NGS tests and other tests for which they knew or were reckless in not knowing involve:

- a. test samples that were not taken from the patient identified in the accompanying paperwork;
- b. tests that were not requested by the patient identified in the accompanying paperwork;
- c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;
- d. tests acquired by illegal kickback payments;

33

e. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and/or

f. incorrect and improper billing codes.

79. The Tele-Med Defendants: BEBD is managed by Braddock. Relator is aware of conversations wherein Braddock described how BEBD often alters requisitions and patient consents from the form originally executed by Medicare subscribers. Individuals from other labs that have dealt with BEBD also warned Relator that BEBD engages in this practice and that referrals originating from BEBD routinely generate the "red flag" concerns previously observed with BioConfirm.

80. Relator's conversations with an individual who formerly worked for Clio indicate that two other tele-med marketing companies, RCE Live and My Specialist MD, also provided Medicare referrals to Klapp on a per-referral basis. This person claimed to know of this arrangement because thousands of such referrals previously made their way to Clio and BioConfirm through Klapp or an associated entity as part of the scheme described above.

81. RCE Live, My Specialist MD, and BEBD are collectively referred to as the "Tele-Med Defendants." On information and belief, Relator alleges that Klapp, Blue Water, BioConfirm and others identified herein paid the Tele-Med

34

Defendants for Medicare referrals on a per-referral basis and that the Tele-Med Defendants knowingly submitted, conspired to submit, and/or caused to be submitted, claims for Medicare reimbursement for NGS tests and other tests for which they knew or were reckless in not knowing involve:

   a. test samples that were not taken from the patient identified in the accompanying paperwork;

   b. tests that were not requested by the patient identified in the accompanying paperwork;

   c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;

   d. tests acquired by illegal kickback payments;

   e. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and/or

   f. incorrect and improper billing codes.

  82. The US Genomix Defendants: Kean and Knowles together own and manage Independent Laboratory Defendant Bio Choice Laboratory, Inc., which is now known as US Genomix ("US Genomix") (collectively with Kean and Knowles, the "US Genomix Defendants"). Knowles previously worked for Clio. Relator's

conversations with marketers who previously provided Medicare referrals to BioConfirm and Clio indicate that such marketers now provide Medicare referrals to US Genomix. As noted above, shortly after the Clio raid, US Genomix began processing Medicare referrals with BioConfirm requisitions. Relator is further aware of conversations wherein both Kean and Knowles confirmed that: (i) US Genomix uses My Specialist MD, RCE Live and other marketers for Medicare referrals; (ii) US Genomix pays what is designed to look like a contractual "flat fee" to a third party for the referrals; (iii) the third party then pays the marketers per referral; and (iv) the contractual flat fee that US Genomix pays the third party is adjusted to reflect the agreed fee per referral; and (v) the US Genomix Defendants and the third party are subjectively aware that the purpose of the contractual flat fee between them is to disguise that US Genomix is paying an agreed fee per referral.4

83.    On information and belief, Relator alleges that the US Genomix Defendants submitted, conspired to submit, and/or caused to be submitted, claims

_____

4 As explained to Relator by someone claiming to be familiar with the arrangement, once a marketer refers the number of tests used to calculate the flat fee, they either continue to refer additional tests under that same contract or begin redirecting tests elsewhere to meet the requirements of other contracts. The flat fee is adjusted for the former but nor for the latter. Either way, the economic reality is that the contractual flat fee is fee per referral.

36

for Medicare reimbursement for NGS tests and other tests for which they knew or were reckless in not knowing involve:

> a. test samples that were not taken from the patient identified in the accompanying paperwork;
>
> b. tests that were not requested by the patient identified in the accompanying paperwork;
>
> c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;
>
> d. tests acquired by illegal kickback payments;
>
> e. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and/or
>
> f. incorrect and improper billing codes.

84.  Additional Defendants: Hurt formerly worked with Clio and now owns and/or manages Independent Laboratory Defendant First Choice. As noted above, First Choice began processing Medicare referrals originally sent to BioConfirm after the Clio raid. On information and belief, Hurt uses First Choice and possibly other labs to assume and continue BioConfirm's fraudulent scheme described above.

37

85. Spivey owns and/or manages SummitHS, which in turn owns and/or manages Independent Laboratory Defendants Opteo and Signify. As noted above, these labs began processing Medicare referrals originally sent to BioConfirm after the Clio raid. On information and belief, Spivey uses SummitHS, Opteo, Signify, and possibly other labs to assume and continue BioConfirm's fraudulent scheme described above. On information and belief, one such new lab used by Spivey to defraud Medicare is Cergena.

86. Accordingly, on information and belief, Relator alleges that the Hurt, Spivey, and the labs associated therewith submitted, conspired to submit, and/or caused to be submitted, claims for Medicare reimbursement for NGS tests and other tests for which they knew or were reckless in not knowing involve:

> a. test samples that were not taken from the patient identified in the accompanying paperwork;
>
> b. tests that were not requested by the patient identified in the accompanying paperwork;
>
> c. tests that were neither ordered nor referred by an actual physician qualified to make such referral;
>
> d. tests acquired by illegal kickback payments;

    e. falsified patient information, including false family medical histories submitted to prove that the subject tests were medically necessary; and/or

    f. incorrect and improper billing codes.

## APPLICABLE LAW

87. The False Claims Act: (i) creates liability for those "who present or directly induce the submission of false or fraudulent claims" to the government; and (ii) "permits, in certain circumstances, suits by private parties on behalf of the United States against [violators]."

88. The Anti-Kickback Statute: (i) creates liability for those who "knowingly and willfully offers or pays any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal healthcare program;" and (ii) provides that "a claim that includes items or services resulting from a violation of [the statute] constitutes a false or fraudulent claim for the purposes of [the False Claims Act]."

89. Compliance with the Anti-Kickback Statute is a condition of payment under Medicare and other government healthcare programs and this condition applies regardless of whether the kickback payor or someone else submits the claim

to the government. Claims arising from a kickback scheme are *per se* false under the False Claims Act and involve an expressed and/or implied false certification to the government that the submitted claim does not involve a kickback.

90. The Office of Inspector General ("OIG") has issued fraud alerts on clinical laboratory services. In those alerts, OIG stated that "[s]ince the physician, not the patient, generally selects the clinical laboratory, it is essential that the physician's decision regarding where to refer specimens is based only on the best interests of the patient." OIG has advised that "[w]henever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business." Likewise, "whenever a referral source solicits or receives anything of value from a laboratory," a similar inference may be made that the thing of value is sought in exchange for the referral of business. In this analysis, "fair market value" means "value for general commercial purposes," which "must reflect and arm's length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them."

## CLAIMS ASSERTED

91. Relator realleges Paragraphs 1 through 90 as though fully set forth herein.

40

## COUNT ONE

92.     The defendants violated the federal False Claims Act by submitting claims, and/or causing the submission of claims, for reimbursement from federal healthcare programs, including Medicare, knowing that the claimant was ineligible for the payments demanded.

93.     Claims submitted, and/or that were caused to be submitted, by the defendants for clinical laboratory testing that violated the federal Anti-Kickback Statute constitute violations of the federal False Claims Act, 31 U.S.C. §3729(a)(1).

## COUNT TWO

94.     The defendants knowingly made, and/or caused to be made, false statements that were material to false claims, including but not limited to false certifications, whether express or implied, that BioConfirm and/or other defendants had complied with all applicable statutes and regulations required as a condition to receiving payment from federal healthcare programs, including Medicare.

95.     Claims submitted, and/or that were caused to be submitted, by the defendants for clinical laboratory testing associated with the express and/or implied false certifications that BioConfirm and/or the lab seeking Medicare reimbursement had complied with such statutes and regulations constitutes violations of the federal False Claims Act, 31 U.S.C. §3729(a)(1)(B).

41

## COUNT THREE

96.     The defendants, through their concerted efforts to carry out their fraudulent schemes to bill government healthcare programs for false claims for clinical laboratory testing, conspired to defraud the federal government by getting false or fraudulent claims allowed or paid by the government in violation of federal False Claims Act, 31 U.S.C §3729(a)(1)(C).

WHEREFORE, Relator requests the following relief for all claims asserted:

A. Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims, collecting monies for the prior submission of false claims, or in any way violating the federal False Claims Act, 31 U.S.C §3729 *et seq.*;

B. Judgment be entered in favor or Relator and the United States of America against defendants in the amount of each and every false or fraudulent claim and so multiplied as provided by federal False Claims Act 31 U.S.C. 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500.00) nor more than eleven thousand dollars ($11,000.00) per claim, as provided in 31 U.S.C. §3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the defendants' scheme, together with penalties allowed for specific claims to be identified at trial after full discovery;

42

C. Twenty-five percent (25%) of the proceeds of this actions to Relator if the United States of America elects to intervene and thirty percent (30%) if it does not;

D. That judgment be granted for Relator and the United States of America against defendants for any costs, including but not limited to, costs of court, expert fees and all attorney's fees incurred by Relators in the prosecution of this lawsuit; and

E. That Relator and the United States of America receive any and all such further relief to which they may be entitled, whether in law or in equity.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, *Qui Tam* Plaintiffs hereby demand a trial by jury.

Dated: Atlanta, Georgia
September 9, 2020

Respectfully submitted,

Law Offices of Joseph L. Manson III
Counsel of Record

/s/ Joseph L. Manson III
Joseph L. Manson III
Law Offices of Joseph L. Manson, III
600 Cameron Street
Alexandria, VA 22314

43

*Pro Hac Vice* Application filed

John P. MacNaughton LLC
Of Counsel

By: _____

John P. MacNaughton
2415 Hanover West Lane NW
Atlanta, GA 30327
Telephone: (404) 444-9556
Georgia Bar No. 464550
John.macnaughtonsr@gmail.com